# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| PRO-LIFE ACTION MINISTRIES, LUCY MALONEY, THOMAS WIL-KIN, and DEBRA BRAUN, | Case No. 23-CV-00853 (ECT/DJF) |
| Plaintiffs, | |
| v. | **PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR ATTORNEYS' FEES AND COSTS** |
| CITY OF MINNEAPOLIS, a Minnesota municipality, | |
| Defendant. | |

## <u>INTRODUCTION</u>

Plaintiffs, by their undersigned counsel, having secured a total victory over Defendant City of Minneapolis, through its concession via Rule 68 Offer of Judgment, Dkt. 99-1, hereby move for their fees and costs pursuant to 42 U.S.C. § 1988 and Rule 54(d) of the Federal Rules of Civil Procedure.

Plaintiffs alleged that the City violated their First Amendment rights in adopting Chapter 405 to the Minneapolis Code, an ordinance restricting their ability to peaceably leaflet and speak on the public right of way crossing the driveway entrance to Minneapolis's lone abortion facility, a Planned Parenthood. After a year and a half of hard-fought litigation, and on the eve of the close of the remaining discovery, the City unexpectedly capitulated.

The outcome of the case was uncertain until the moment of the Offer of Judgment, as the legality of municipal limitations on leafletting and speech in the areas outside the nation's abortion facilities remains very much in flux. *See, e.g., Fla. Preborn Rescue, Inc. v. City of Clearwater, Fla.,* 2023 WL 7181593, at *11 (M.D. Fla. Oct. 20, 2023) (upholding driveway buffer zone outside abortion facility), *appeal pending sub.* No. 23-13501-Y (11th Cir.). Numerous courts in recent years have also upheld related buffer and "bubble" zones that restrict the positioning of, and the leafletting and speech activities of, sidewalk counselors outside abortion facilities. *See, e.g., Turco v. City of Englewood, New Jersey*, 935 F.3d 155 (3d Cir. 2019); *see also Price v. City of Chicago*, 915 F.3d 1107 (7th Cir. 2019), *cert. denied sub nom. Price v. City of Chicago, Illinois*, 141 S. Ct. 185, 207 L. Ed. 2d 1116 (2020). And indeed, just three months prior to the filing of this case, another court had also upheld a similar ordinance in New York. *Vitagliano v. Cnty. of Westchester*, 2023 WL 24246, at *3 (S.D.N.Y. Jan. 3, 2023). Often, these cases turned on facts known only by the government entities which passed them. *See, e.g., Fla. Preborn Rescue,* 2023 WL 7181593, at *8 (noting that City of Clearwater records on police enforcement and traffic safety showed a significant government interest).

However, through substantial briefing and argument, Plaintiffs survived Defendant's Motion to Dismiss, and then through careful and determined discovery, Plaintiffs constructed a compelling case against the City. In the process, Plaintiffs learned that the City had worked hand in glove with Planned Parenthood to craft and enact Chapter 405, despite having made no attempt to enforce existing laws prohibiting blocking driveways or obstructing abortion clinic entrances. In fact, Plaintiffs eventually learned the City had *no evidence* that Plaintiffs ever even impeded traffic at all, let alone violated existing laws. Plaintiffs also determined that the City's guidance to police was to *avoid* enforcing Chapter 405. Breen Decl. at ¶ 49 and Ex. B at 7 (MPLS001058). More stunningly, in the teeth of claims that law enforcement shortages made Chapter 405 necessary, Plaintiffs discovered that many surveillance cameras monitor their actions at all times, thus making enforcement of other applicable laws a much more speech-protective alternative to Chapter 405. Breen Decl. Ex. G. at 12 (transcript p. 95). This process was not easy, and at multiple points in the discovery process, the parties required the assistance of the Court.

Ultimately, the City amended Chapter 405 to explicitly exempt Plaintiffs' First Amendment-protected activities; confirmed that Plaintiffs' sidewalk counseling does not violate Chapter 405; and made its Rule 68 Offer of Judgment allowing Plaintiffs "to take judgment against the City on all claims made

3

or which could have been made." Dkt. 99-1 at 1. In the offer, the City added: "[s]aid relief is inclusive of all of Plaintiff[s'] claims and relief sought against Defendant as set forth in Plaintiff's Amended Complaint."

Plaintiffs accepted the offer and, after this year-and-a-half ordeal, have resumed their peaceful leafletting and speech on the entire sidewalk outside the Planned Parenthood, offering assistance to pregnant women in need and their children. On their very first day back on the sidewalk outside Planned Parenthood, a pregnant mother arriving at the facility even took Plaintiffs up on their offer of assistance and decided against having an abortion.[1]

In view of their total success and expert handling of the case, Plaintiffs seek a modified out-of-district rate for the Thomas More Society's attorneys, and they seek in-district rates for their local counsel, Mohrman, Kaardal & Erickson, P.A., along with their other costs.

## ARGUMENT

### I. Plaintiffs' total victory permits them to recover their costs, including attorneys' fees.

---

[1] Karnowski, Steve, "Minneapolis softens law on obstructing abortion clinics in response to free-speech lawsuit," Associated Press (Dec. 16, 2023), https://ap-news.com/article/minneapolis-abortion-clinic-access-lawsuit-edb5533e23342488c30fe8b0f633bda9 (Recording that Pro-Life Action Ministries "had a victory on their first day back outside the Minneapolis clinic when they approached a woman who had parked on the street," and quoting Pro-Life Action Ministries CEO Brian Gibson saying "We had a baby saved.").

In any action brought to enforce 42 U.S.C. §1983, "the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs." 42 U.S.C. §1988(b).

Plaintiffs here are the prevailing party via a Rule 68 Offer of Judgment, which Plaintiffs accepted. In that accepted offer, the City agreed that the relief granted to Plaintiffs "is inclusive of all of Plaintiff's claims and relief sought against Defendant as set forth in Plaintiff's Amended Complaint." Dkt. 99-1 at 2. Further, the City agreed that "Plaintiff shall have the right to petition the Court for Plaintiff[s'] claimed reasonable attorneys' fees and costs as a prevailing party in this action pursuant to 42 U.S.C. § 1988(b)." *Id.* Both the City and Plaintiffs therefore agree: Plaintiffs are a prevailing party on all claims and may recoup their costs, including attorneys' fees, from the City.

## II. Plaintiffs' are entitled to their reasonable attorneys' fees.

Courts in the Eighth Circuit use the "simple" lodestar method to calculate reasonable attorneys' fees. *M.B. by Eggemeyer v. Tidball*, 18 F.4th 565, 568 (8th Cir. 2021). That method involves multiplying "the reasonable hourly rates" for attorneys by the "number of hours reasonably expended" on the case. *Id.* (citing *Hanig v. Lee,* 415 F.3d 822, 825 (8th Cir. 2005)). After determining the lodestar, district courts then "adjust[] attorneys' fees upward or downward based on the 'degree of success obtained' by the plaintiff, *which is the most*

*critical factor in determining the fee award.*" *Phelps-Roper v. Koster*, 815 F.3d 393, 398 (8th Cir. 2016) (emphasis added); *see also Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983) (when "a plaintiff has obtained excellent results, [the] attorney should recover a fully compensatory fee"). In this case, excellent results are exactly what Plaintiffs secured: due to Plaintiffs' suit, the City amended Chapter 405 to exclude from its reach "any person or group engaging in conduct protected by the United States Constitution, the Minnesota Constitution, or federal or Minnesota law"—in other words, the Plaintiffs and those like them, per se, putting them on an equal footing in the ordinance with law enforcement and clinic escorts. The City also consented to judgment on "all of Plaintiff[s'] claims." Dkt. 99-1 at 1.

As a result, "Plaintiffs obtained full relief on the merits of their claims and are entitled to seek reasonable attorneys' fees as to *the entire litigation.*" *Minnesota Voters All. v. City of Saint Paul*, 2021 WL 1100901, at *6 (D. Minn. Mar. 23, 2021) (emphasis added).

> ### a. Plaintiffs' Minneapolis-based lawyers are entitled to rates consistent with those they previously received from this Court, with adjustments for inflation and additional experience.

Plaintiffs' legal team worked with Minneapolis-based local counsel at the firm Mohrman, Kaardal & Erickson, P.A. ("MKE"). Three members of this firm

participated in their case: named shareholder Erick Kaardal, paralegal John Grzybek, and associate Elizabeth Nielsen.

Erick Kaardal, an MKE shareholder, has represented clients throughout Minnesota state courts, federal district and appellate courts, and even the U.S. Supreme Court. A significant part of his practice includes constitutional and civil rights litigation. Recently, Mr. Kaardal was awarded a rate of $550 per hour in a First Amendment case in the District of Minnesota, defending his clients' rights against infringement by the City of Minneapolis. *Minnesota Voters All. v. City of Saint Paul and City of Minneapolis*, 2021 WL 1100901, at *2 (D. Minn. Mar. 23, 2021). The court there concluded that his "claimed hourly billing rates [were] reasonable." *Id.* In the same case, Mr. Kaardal's fellow named shareholder, William Mohrman, was awarded $600 per hour based on his additional years of experience over Mr. Kaardal. The same defendant there—the City of Minneapolis—was required to pay these reasonable rates in 2021.

Two years ago, the Eighth Circuit awarded Mr. Kaardal even higher rates in *Styczinski v. Grace Arnold*, U.S. Court of Appeals No. 21-2936 (Oct. 4, 2022). Kaardal Decl. ¶ 24, Exs. B and C. In that case, Mr. Kaardal received $625 per hour. *Id.*

But those rates require adjustment in view Mr. Kaardal's increased experience. After a modest $50 increase per hour for two more years of experience, his current rate is $675 per hour in 2022 dollars. And the rates must be adjusted for inflation, for which courts in this district use the Bureau of Labor Statistics' CPI Inflation Calculator.[2] *See, e.g., Berscheid v. Experian Info. Sols., Inc.*, 2023 WL 3750182, at *4 (D. Minn. June 1, 2023); *Miller v. Bd. of Regents of Univ. of Minnesota*, 402 F. Supp. 3d 568, 583 (D. Minn. 2019). Adjusting $675 per hour in September 2022 dollars to December 2024 dollars, Mr. Kaardal is entitled to a reasonable hourly rate of at least $700 per hour. Kaardal Decl. ¶ 26.

The Eighth Circuit has held that a "reasonable hourly rate generally means the ordinary fee for similar work in the community." *Little Rock Sch. Dist. v. Arkansas*, 674 F.3d 990, 997 (8th Cir. 2012) (cleaned up). Therefore, to confirm Mr. Kaardal's rate, Plaintiffs consulted the Wolters Kluwer 2023 Real Rate Report ("2023 Report"). Breen Decl. ¶ 35 and Ex. O, Kaardal Decl. ¶ 28-29. Numerous courts around the country, including within this Circuit, have relied on previous iterations of the Wolters Kluwer Real Rate Report in determining a reasonable hourly rate for attorneys' fees awards, because it "provides

---

[2] CPI Inflation Calculator, U.S. Bureau of Lab. Stats., https://www.bls.gov/data/inflation_calculator.htm.

a number of data points for assessing the reasonableness of counsel's hourly rates, based on actual billing rates charged to clients." *Yates v. Symetra Life Ins. Co.*, 2022 WL 1618787, at *5 (E.D. Mo. May 23, 2022), *aff'd*, 60 F.4th 1109, 1119 (8th Cir. 2023) ("[W]e affirm [the lower court's] grant of attorney's fees."). The 2023 Report categorizes hourly rates for partners and associates by city, practice area, and whether they are litigators, and further divides the rates into first quartile, median, and third quartile tranches.

Mr. Kaardal's rate falls below the top-tier rate charged by similar attorneys, once again confirming its reasonableness. Kaardal Decl. ¶ 26, 35. This rate also illustrates that the 2023 Report is a reliable authority for local rates. Further still, Mr. Kaardal has also reviewed the 2023 Report, and testified that it accurately represents fees in the Minneapolis market. Kaardal Decl. ¶ 28.

Accordingly, Plaintiffs relied on the 2023 Report to identify Ms. Nielsen's rate as well. She graduated *magna cum laude* from the University of Illinois in 2022, where she won two awards for excellence in trial advocacy. Prior to that, she graduated *summa cum laude* and was a Chancellor's Scholar at Southern Illinois University.

Based on Ms. Nielsen's years of experience and excellent academic history, her work merits $450 per hour, which is an above-median rate for a Minneapolis litigation associate. Breen Decl., Ex. O at 4 (report p. 17). This rate is

also the market rate Ms. Nielsen charges her fee-paying clients. Kaardal Decl. ¶ 28.

John Grzybek is a paralegal with over 40 years of experience. He also participated in *Minnesota Voters All.* and was awarded a "reasonable" billing rate of $230 per hour in that case. Adjusted for inflation, and without increases for additional experience, Mr. Grzybek warrants $275 per hour.

### b. Plaintiffs' Out-of-District attorneys are entitled to national or Chicago rates because this case turned on their unique expertise.

Though courts often determine reasonable hourly rates based on local rates, "attorney[s'] fees under 42 U.S.C. § 1988 are not limited to the prevailing rate in the district where the case is tried." *Avalon Cinema Corp. v. Thompson*, 689 F.2d 137, 140-41 (8th Cir. 1982). Particularly in complex areas of law, such as abortion-related constitutional litigation, allowing national subject-matter experts a higher rate is warranted. *See Planned Parenthood, Sioux Falls Clinic v. Miller*, 70 F.3d 517, 519 (8th Cir. 1995) (awarding attorneys' fees based on rates typical for Chicago-based lawyers, rather than South Dakota lawyers, due to those attorneys' expertise in abortion clinic access); *Kansas Pub. Emps. Ret. Sys. v. Reimer & Koger Assocs.*, 165 F.3d 627, 631 (8th Cir. 1999) (award-ing fees based on Chicago rates rather than Kansas City rates); *see also Casey v. City of Cabool*, 12 F.3d 799, 805 (8th Cir. 1993) ("A national market or a

market for a particular legal specialization may provide the appropriate market.").

Plaintiffs' attorneys from the Thomas More Society ("TMS") are recognized as national experts in the field—there is no equivalent public interest law firm in the District of Minnesota to which Plaintiffs could have turned for help. Plaintiffs here are a small, politically unpopular nonprofit, along with its staff and volunteers, none of whom could have funded substantial federal litigation against a large municipality with a well-funded and organized Law Department and scores of seasoned attorneys at its disposal.

TMS's lawyers are "leaders in the field" with "extensive experience" defending the rights of sidewalk counselors across the country. *Miller v. Dugan*, 764 F.3d 826, 831 (8th Cir. 2014). They are experienced in litigating the questions presented in this case, which hinge on significant and developing questions of First Amendment law. Recent representative matters include *Coalition for Life St. Louis v. City of Carbondale, Illinois*, No. 23-cv-10651 (S.D. Ill. 2023) (First Amendment challenge to a "bubble zone" outside local abortion facilities; petition for writ of certiorari filed July 16, 2024 pending); *Florida Preborn Rescue, Inc. v. City of Clearwater, Fla.*, No. 8:23-cv-1173, 2023 WL 7181593 (M.D. Fla. 2023) (First Amendment preliminary injunction challenge to a "buffer zone" outside local abortion facility; on appeal at No. 23-13501-Y

(11th Cir.)); *Lopez v. City of San Diego*, No. 3:24-cv-01577 (S.D. Cal. 2024) (First Amendment challenge to a no-speech "bubble zone" outside local abortion facilities and to restrictions on causing "substantial distress" outside those facilities). And in many, many more locations across the country, TMS attorneys assist and resolve disputes with local municipalities, protecting the constitutional rights of peaceable sidewalk advocates without litigation.

Moreover, a key issue in this case was whether Chapter 405 was necessary in view of a law that TMS attorneys regularly litigate, the Freedom of Access to Clinic Entrances Act (18 U.S.C. § 248) ("FACE Act"). Minneapolis never attempted to enforce this pre-existing law (or the Minnesota equivalent). This failure, and the similarity between Ch. 405 and the FACE Act, figured prominently in Plaintiffs' theory of the case and throughout discovery:

- Discovery revealed that it was common knowledge among abortion clinic staff members and City employees that Chapter 405 was intended (in part) to reiterate the FACE Act at the local level. Breen Decl. ¶ 49, Ex. B at 2 (MPLS000568).
- The City discussed the FACE Act with Plaintiffs during its depositions . Breen Decl. ¶ 50, Exs. C at 5 (transcript p. 156) and D at 7 (transcript p. 206).
- The City cited the FACE Act in its contention interrogatories as an alternative the City considered to Chapter 405 prior to its enactment. Breen Decl. ¶ 51, Ex. J at 2.
- The existence and nonenforcement of the FACE Act was at issue in litigating the City's Motion to Dismiss. Breen Decl. ¶ 51, Ex. I at 5 (transcript p. 13).

- Plaintiffs deposed Ch. 405's sponsor and both of the deposed Planned Parenthood staff disclosed by the City as fact witnesses on their knowledge of the FACE Act. Breen Decl. ¶ 50, Exs. E at 7-8 (transcript of ordinance sponsor, pp. 175-176), F at 5 (transcript of Planned Parenthood director p. 145), and G at 7-10, 14-15 (transcript of Planned Parenthood security pp. 59-60, 81-82, 109-110)
- Had the case advanced to a 30(b)(6) deposition, Plaintiffs would have deposed the City on "alternatives . . . attempted by the City prior to [Ch. 405's] enactment" and the "applicability of other . . . federal laws to Plaintiffs' activities in the vicinity of the Planned Parenthood, including any steps taken to enforce those laws, whether civilly or criminally, with respect to Plaintiffs' activities." Breen Decl. ¶ 50, Ex. H at 6-7.

TMS attorneys frequently handle FACE Act cases, which necessarily require analysis of the First Amendment and the lines between protected free speech and unlawful activity. *See, e.g.,* 18 U.S.C. § 248(d)(1) ("Nothing in [the FACE Act] is intended to . . . prohibit any expressive conduct (including peaceful picketing or other peaceful demonstration) protected from legal prohibition by the First Amendment to the Constitution[.]"). TMS's expertise helped shape the winning litigation of the case and would have played even more prominently at summary judgment or trial. As a sample of TMS's FACE Act expertise, TMS (with the undersigned as trial counsel) defeated the United States Department of Justice and obtained a full acquittal on felony FACE Act from the jury in *United States v. Houck*, No. 2:22-cr-00323 (E.D. Pa. Jan. 15, 2023). TMS also recently prevailed on appeal in *New York by James v. Griepp*, 11

F.4th 174 (2d Cir. 2021), where the Second Circuit affirmed a denial of an injunction against TMS clients based on the FACE Act.

Among other TMS cases involving the FACE Act, the undersigned led a successful defense of a sidewalk counselor against the DOJ's attempt to use the FACE Act to enjoin his peaceable sidewalk counseling, defeating the Government's motion for preliminary injunction after a day-long evidentiary hearing, after which it dismissed the case. *See United States v. Scott*, No. 11-cv-01430, Dkt. 181 & 182 (D. Col. 2012).

Moreover, Plaintiffs understand that the FACE Act has not been substantially litigated in Minnesota, at least in recent memory, and the most recent significant FACE Act litigation in the Eighth Circuit appears to have been in 2007, when TMS attorneys defeated the DOJ in *United States v. Weslin*, 2007 WL 316295 (D. Neb. Jan. 31, 2007). It is thus understandable why this experience is specialized in a small group of public interest law firms in a handful of cities across the country.

Plaintiffs relied on the TMS attorneys' "extensive specialized experience representing [sidewalk counselors] against [municipalities]" to achieve their total victory. *Miller v. Bd. of Regents of Univ. of Minnesota*, 402 F. Supp. 3d 568, 592 (D. Minn. 2019) (granting an attorney fee award for Minneapolis-

based attorneys based on local rates, and an above-market rate their special-ized, Oakland-based co-counsel). In such situations, "[n]ational market or a market for a particular legal specialization" describes the "appropriate mar-ket" for attorneys' fee awards. *Casey v. City of Cabool, Mo.*, 12 F.3d 799, 805 (8th Cir. 1993).

### c. Plaintiffs' Out-of-District attorneys are also entitled to national or Chicago rates because there is no other firm in the District which could have handled this case.

As attested to by the declaration from veteran Minneapolis attorney Er-ick Kaardal, out-of-district counsel like TMS were necessary, given the com-plexity of the legal issues and the identity of the clients. His firm "would not have been able to join Plaintiffs' case without a guarantee of hourly payment," which was provided by the involvement of TMS. Kaardal Decl. ¶ 11. He further affirms that he "know[s] of no other firm in Minnesota that would have taken on these Plaintiffs pro bono[.]" *Id.* One reason for this is "ideological differences with Plaintiffs," who are pro-life and thus generally unpopular in Minnesota legal circles. *Id.* The two other reasons he identifies are "lack of competence to engage in complex federal constitutional litigation" and "lack of sufficient fi-nancial backing (and commensurate breadth and depth of legal talent) to meet the burden of litigating a case like this against a well-funded and determined opponent like the City of Minneapolis." *Id.*

15

As a result, it was necessary for Plaintiffs to look out of state for assistance. And, "there is no firm in Minnesota—or anywhere in the Midwest—that comes close to TMS in terms of experience and expertise in handling these pro-life speech cases, a unique and difficult specialty within First Amendment law." *Id.* ¶ 12. Mr. Kaardal's declaration cites the Supreme Court's recent observation that "the High Court's abortion jurisprudence has bled over and 'distorted First Amendment doctrines.'" *Id.* (citing *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 287, 142 S. Ct. 2228, 2276 (2022)). But, "TMS is well versed in the contours of this 'distortion' and how to effectively combat it in federal court litigation, against hostile government officials and entities with near-unlimited resources to spend." *Id.*

TMS lawyers bring an exceptional level of experience with the precise issues in this case. *See id.* ¶ 13 ("[T]here is no other public interest law firm in the country with more experience in representing sidewalk counselors against hostile municipal governments."). Therefore, TMS was the natural choice for the Plaintiffs since even Mr. Kaardal's firm could not have taken the matter without payment and would not have provided the "same level of relevant specialized experience in sidewalk counseling speech cases as TMS" and likely could not have handled it as "quickly and efficiently" as TMS did. *Id.*

Thus, because of the unpopularity of the Plaintiffs in the District and the lack of firms with the same level of expertise in this field of specialized practice (*viz.*, First Amendment rights of pro-life sidewalk advocates), Plaintiffs were more than justified in going of the District to secure TMS, which is based in Chicago. Plaintiffs' counsel should thus receive either Chicago or national rates for their work.

### d. The rates sought for Plaintiffs' Out-of-District attorneys are reasonable for Chicago.

Plaintiffs have identified multiple consistent benchmarks for the correct market rate for their TMS lawyers.

First, Plaintiffs submit the declaration of Sally Wagenmaker, an experienced Chicago practitioner of 30 years. Wagenmaker Decl. ¶ 2. Because she is a founding partner of her firm, she must keep abreast of market rates that clients pay to Chicago firms. *Id.* at ¶ 3. Her experience litigating and handling administrative cases sharpens her knowledge of these rates. *Id. at* ¶ 4. Ms. Wagenmaker testifies that Chicago firms charge over $1,200 per hour for partners and $800 per hour for associates. *Id. a*t 17. Based on her personal knowledge and experience, she confirms that the 2023 Report is a reliable indicator of market rates. *Id.*

Second, the 2023 Report shows that the third quartile hourly rate for a partner in a Chicago firm was $1,235 per hour; the median hourly rate for a

partner was $873; the third quartile rate for an associate was $828; and the median associate rate was $618. Breen Decl., Ex. O at 5 (report p. 36). Chicago rates would be appropriate in this case because, as the Seventh Circuit recognizes, "[a]ttorneys with specialized skills in a narrow area of law, such as admiralty law, patent law, or antitrust and other complex litigation, tend to be found in large cities, where an attorney may have a greater opportunity to focus on a narrow area of law." *Chrapliwy v. Uniroyal, Inc.*, 670 F.2d 760, 769 (7th Cir. 1982); *accord Avalon Cinema,* 689 F.2d at 141 ("We think our view of this matter is not inconsistent with *Chrapliwy*.").

Third, Plaintiffs have reviewed national rates for complex litigation. "[T]he Supreme Court has compared the complexity of civil rights litigation to antitrust litigation." *King v. Turner*, 2007 WL 1219308, at *1 (D. Minn. Apr. 24, 2007); *see also Hensley v. Eckerhart*, 461 U.S. 424, 447 (1983) (Brennan, J., concurring) ("[T]he Senate Report specifies that fee awards under § 1988 should be equivalent to fees 'in other types of equally complex Federal litigation, such as antitrust cases.'"). The 2023 Report is again instructive, and records that litigation partners specializing in antitrust work in the third quartile earned $1,110 per hour, partners in the median earn $1,052 per hour, third quartile associates earned $841 and median associates earned $763. Breen Decl., Ex. O at 6 (report p. 79).

Thus, TMS's Peter Breen and Joan Mannix, both with over 20 years of experience (Breen Decl. ¶ 32-33), easily merit a rate of $1,172.50 per hour, which is the average of third quartile litigating partner rates for Chicago ($1,235) and antitrust litigators ($1,110). Adjusted for inflation between June 2023 (the date of the 2023 Report information) and December 2024, a reasonable rate for them is $1,210.

Plaintiffs' lead drafter in this case, B. Tyler Brooks, has 18 years of experience, clerked in federal court for three years, and earned his J.D. from Vanderbilt and an LL.M. from Villanova. Breen Decl. ¶ 23-27. His reasonable rate is $962.50 per hour, the average of the above-referenced median partner rates ($873 for Chicago firms, $1,052 for antitrust litigators). Adjusted for inflation, this is $995.

Michael McHale has over 12 years of specialized legal experience almost exclusively devoted to First Amendment issues, after receiving law school training from one of the nation's leading First Amendment scholars (Prof. Richard F. Duncan of the Univ. of Nebraska College of Law) and having clerked for the U.S. Court of Appeals for the Eighth Circuit. Breen Decl. ¶ 28-29. His reasonable rate is also slightly below Mr. Brooks's, at $950 per hour.

Nathan Loyd graduated with honors from Georgetown Law School in 2020, attended the University of Notre Dame and serves as a Major in the Air

Force Reserve. During his last two years of law school, he worked full time at one of the top patent firms in the country, and litigated there between graduation and joining TMS. Breen Decl. ¶ 30-31. Based on his expertise and years of experience, his reasonable rate is $690 per hour, which is the average of the above-referenced median rates for associates ($618 for Chicago, $763 for antitrust litigators). Adjusted for inflation, this is $715.

Despite their entitlement to higher rates, Plaintiffs seek compensation for attorneys' fees at a significant reduction. These adjusted rates also align with rates indicated in the 2023 Report for top-quartile, expert Minneapolis-based commercial litigators.

Thus, although Mr. Breen and Ms. Mannix could claim $1,210 per hour, Plaintiffs assert a rate of $875 per hour. This is a 27% discount from their reasonable rate, and aligns with third quartile partners focusing on commercial litigation in Minneapolis. Breen Decl., Ex. O at 88.

Plaintiffs assert a rate of $800 per hour for Mr. Brooks, which is between the median and third quartile rates for partner-level litigators (a discount of 20% from his reasonable market rate). *Id.*

For Mr. McHale, Plaintiffs assert a rate of $775 per hour, also between the median and third quartile rates for partner-level litigators, for a discount of 18%.

Last, for Mr. Loyd, Plaintiffs assert a rate of $550 per hour, between the median and third quartile rates for Minneapolis-based associates in commercial litigation. This rate is a 23% discount.

Accordingly, the table below reflects the rates for each member of Plaintiffs' legal team.

| Attorney/Paralegal | Rate |
|---|---|
| Peter Breen | $875 |
| Joan Mannix | $875 |
| Erick Kaardal | $700 |
| B. Tyler Brooks | $800 |
| Michael McHale | $775 |
| Nathan Loyd | $550 |
| Elizabeth Nielsen | $450 |
| John Grzybek | $275 |

Therefore, the proposed rates for Plaintiffs' attorneys are reasonable and consistent with the rates paid to similarly-qualified litigators. Wagenmaker Decl. ¶16; Kaardal Decl. ¶35, 37-40. Plaintiffs are entitled to attorneys' fees based on these rates, with no further reductions.

### e. The rates sought for Plaintiffs' Out-of-District attorneys are commensurate with the rates of specialists in this District.

Plaintiffs have confirmed that these rates are also reasonable in view of this District's historical attorneys' fees awards for civil rights litigators.

In November 2022, this Court awarded hourly rates of $855, $730, and $685 for Minneapolis-based partners litigating against the City of Minneapolis. *Stevenson v. Bauer*, No. 0:20-cv-02007, Dkt. 103 (D. Minn. Nov. 17, 2022); (included in the Kaardal Decl. as Ex. D). Adjusted for inflation, these rates are $905, $775, and $725 respectively. Minneapolis-based associates in that case were awarded $580 and $460, or $615 and $485 in 2024 dollars. *Id.* And in that case, the Court refused to discount the attorneys' rates as the City requested, due to those litigators' skill and reputation in civil rights work. *Stevenson* at 9.

In another recent case seeking fees under 42 U.S.C. § 1988, this Court awarded hourly rates of $855 for a partner, and rates ranging from $435 per hour to $560 per hour for associates. *Nguyen v. Foley,* 2022 WL 1026477, at *4 (D. Minn. Apr. 6, 2022); Kaardal Decl. ¶ 37. The Court found these rates to be reasonable in light of those attorneys' specializations, despite objections from the opposing party. *Id.* Adjusted for inflation, that partner rate is $935, and the associate range is $475 to $610.

As another example of local civil rights rates, the Court found in March 2011 that $600 per hour was reasonable for a managing partner of a general litigation firm's civil rights group. *Madison v. Willis*, 2011 WL 851479, at *1 (D. Minn. Mar. 9, 2011); Kaardal Decl. ¶ 38. But TMS is not just a civil rights

group buried inside a general litigation firm. Instead, TMS's entire firm specializes in First Amendment law, and Peter Breen and Joan Mannix are both in the firm's management. The $600 per hour rate from 2011 is equivalent to $845 today, and easily justify for the proposed rates for Mr. Breen and Ms. Mannix.

The table below summarizes these rates awarded in District of Minnesota civil rights cases discussed above.

| __Case__ | __Senior Attorney Rate (2024 dollars)__ |
|:---:|:---:|
| *Sorenson v Bauer* | $905 |
| *Nguyen v. Foley* | $935 |
| *Madison v. Willis* | $845 |

Moreover, the 2023 Report supports these rates for Minneapolis commercial litigators. Breen Decl. Ex. O at 7 (report p. 88). The Report indicates that the rates for Minneapolis commercial litigators in the third quartile is $875, or $900 in December 2024 dollars. This is above the rates sought by Plaintiffs' out-of-district counsel here.

Here, Plaintiffs ask for rates below those previously found to be reasonable by this Court. The Court should award attorneys' fees based on the rates Plaintiffs request.

**f.  Plaintiffs' lawyers expended a reasonable number of hours on this case, where victory was far from certain.**

23

As to the reasonable number of hours, Plaintiffs' time sheets reflect the reasonable number of hours that were necessary and appropriate for the tasks required to achieve the outstanding results obtained in this case.

The Supreme Court has recognized that in civil rights cases, "the most critical factor" in determining the reasonableness of a fee award "is the degree of success obtained." *Farrar v. Hobby*, 506 U.S. 103, 114 (1992) (citing *Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983)). When a plaintiff has obtained "excellent results, [the] attorney should recover a fully compensatory fee." *Hensley*, 461 U.S. at 434. This is exactly the case here, because Plaintiffs have received complete relief from the unconstitutional burdens of Chapter 405.

Once a prevailing party has trimmed its hours for excessive or redundant time, its remaining time should be afforded a presumption of reasonableness. *See Monohon v. BNSF Ry. Co., No.* 2022 WL 2129134, at *2 (S.D. Iowa June 14, 2022) ("when an attorney represents to the court that he or she has searched his client's files and has produced all documents responsive to a discovery request, we accept the representation at face value, as we do other representations of counsel throughout the trial process. Why do we not treat the Plaintiffs' attorneys' representations that the work was done for the benefit of the class in the same manner?"); *M.B. v. Tidball*, 2020 WL 1666159, at *14 (W.D. Mo. Apr. 3, 2020), *aff'd sub nom. M.B. by Eggemeyer v. Tidball*, 18 F.4th

565 (8th Cir. 2021) ("Because Plaintiffs did not know if they would be compensated for their efforts in this case, they had an incentive to be efficient."); *Moreno v. City of Sacramento*, 534 F.3d 1106, 1112 (9th Cir. 2008) ("It must also be kept in mind that lawyers are not likely to spend unnecessary time on contingency fee cases in the hope of inflating their fees. The payoff is too uncertain, as to both the result and the amount of the fee . . . By and large, the court should defer to the winning lawyer's professional judgment as to how much time he was required to spend on the case; after all, he won, and might not have, had he been more of a slacker."). This presumption is all the more valid when plaintiffs engage a pro-bono law firm to seek nominal damages and injunctive relief, since such firms will never receive any contingent recovery from their clients and run on tight budgets from unpredictable donations.

Additionally, the majority of the recorded hours are directly attributable to the City's aggressive defense, which included broad requests for production and redundant depositions of Plaintiffs, including *three* sidewalk counselors with no history of violating the FACE Act or Ch. 405, and who had nearly identical experiences with Chapter 405. Breen Decl. ¶41. Moreover, the City made the unusual decision to intensely probe Plaintiffs' actions and motivations, despite the already-public legislative record, which supposedly justified passing

Ch. 405 on its own, containing zero evidence they had ever done anything improper. The decision was all the more unusual given that the *City*—not Plaintiffs—bore the burden of justifying the ordinance after losing its Motion to Dismiss, and should have been able to do so *with evidence it already possessed at the time of passage*. The City decided to aggressively litigate discovery and must live with its decision.

Moreover, the City's shoddy work proofing its own productions resulted in incoherent privilege claims, bates number overlaps, and corrective productions, all of which consumed much attorney time to unravel. Breen Decl. ¶¶42-48. And in the unraveling, the City discovered it had improperly withheld and over-redacted numerous documents, resulting in four reissued productions and additional documents available to Plaintiffs. *Id.* at ¶ 42.

Plaintiffs should receive full compensation for this time, which was incurred solely due to the City's pattern of not fully complying with their discovery obligations in a timely manner and in making productions that were, in multiple instances, less than coherent. *See City of Riverside v. Rivera*, 477 U.S. 561, 580 n.11 (1986) ("The government cannot litigate tenaciously and then be heard to complain about the time necessarily spent by the plaintiff in response.") (citation omitted); *Cuff v. Trans States Holdings, Inc.*, 768 F.3d 605, 611 (7th Cir. 2014) ("[H]yperaggressive defendants who drive up the expense

of litigation must pay the full costs, even if legal fees seem excessive in retrospect.").

Accordingly, the table below presents the total hours for which Plaintiffs seek reimbursement, along with the respective rates.

| Attorney/Paralegal | Rate | Hours | Total |
|---|---|---|---|
| Peter Breen | $875.00 | 146.1 | $127,837.50 |
| Joan Mannix | $875.00 | 24.2 | $21,175.00 |
| Erick Kaardal | $700.00 | 4.5 | $3,150.00 |
| B. Tyler Brooks | $800.00 | 531.3 | $425,040.00 |
| Michael McHale | $775.00 | 10.2 | $7,905.00 |
| Nathan Loyd | $550.00 | 340.0 | $186,972.50 |
| Elizabeth Nielsen | $450.00 | 5.9 | $2,655.00 |
| John Grzybek | $275.00 | 60.7 | $16,692.50 |

These hours are supported by Plaintiffs' contemporaneous hour logs. Breen Decl. Ex. L. Both Ms. Wagenmaker and Mr. Kaardal have reviewed these logs, as well. Ms. Wagenmaker testifies that TMS efficiently staffed and prosecuted this case, and expended a reasonable amount of hours, which clients would expect and pay for. Wagenmaker Decl. ¶ 18, 21. Mr. Kaardal confirms that the hours records show work that was reasonable and necessary to the complete victory in this case, and that a fee paying client would not request further reductions. Kaardal Decl. ¶ 42. Therefore, Plaintiffs seek a lodestar of $791,427.50.

This amount already includes major discounts on rates and eliminated many time entries for attorneys and paralegals which were redundant or excessive. The Court should honor the "strong presumption that the lodestar figure is reasonable" as a result. *Blackorby v. BNSF Ry. Co.*, 60 F.4th 415, 420 (8th Cir. 2023) (cleaned up).

### g. Plaintiffs' requested rates are further justifiable via lodestar enhancement due to the degree of success obtained and the City's unusually aggressive defense.

Plaintiffs' requested rates are justifiable under the extensive precedent and evidentiary support provided above. However, should the Court to find that lower hourly rates are appropriate, Plaintiffs respectfully urge that those rates be enhanced upward.

First, Plaintiffs' attorneys secured a complete victory here. Plaintiffs even took judgment in their favor on "*all of Plaintiff's claims* and relief sought against Defendant as set forth in Plaintiff's Amended Complaint" (Dkt. 99-1 at 1, emphasis added), which even includes claims the Court dismissed. Their total victory warrants an enhancement on the lodestar. *See Hall v. Sebelius*, 2016 WL 424965, at *3 (D. Minn. Feb. 3, 2016) ("The district court begins by determining the lodestar and then adjusts attorneys' fees upward or downward based on the 'degree of success obtained' by the plaintiff, which is the most critical factor in determining the fee award.").

Another reason the Court should award an enhancement is that the City forced "an extraordinary outlay of expenses" during "exceptionally protracted" litigation. The Supreme Court has held that fee enhancements may be appropriate in such cases. *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 555 (2010). Though the Supreme Court did not define a comparator for *ordinary* expenses, the aggressive defense strategy adopted by the City in this case is undoubtedly extraordinary when compared to the ordinary First Amendment cases the City has recently defended.

For example, in *Khounedaleth v. City of Minneapolis*, 581 F. Supp. 3d 1128 (D. Minn. 2022), the plaintiff asserted that the City's curfew during the George Floyd riots infringed her First Amendment right to free speech and free assembly. *Id.* at 1136. Just two months after the City lost its Motion to Dismiss, it made a Rule 68 Offer of Judgment, which the plaintiff accepted. *Khounedaleth v. City of Minneapolis*, No. 0:20-cv-02325, Dkt. No. 40 (D. Minn. Mar. 25, 2022). Breen Decl. ¶ 54, Exs. M and N. Even though the City arrested the plaintiff to protect public safety during the most dangerous and violent period in Minneapolis's history, the City abandoned its defense, apparently without taking discovery.

But here, Plaintiffs faced a full-scale defense from the City. The City required four depositions, one of each Plaintiff, in contrast to the three Plaintiffs

took. Breen Decl. ¶ 41, 50. The City also made extensive discovery requests, including "communications between Pro-Life Action Ministries and its sidewalk counselors from January 1, 2020 to the present"; "any . . . document created . . . related to [Plaintiffs'] activities at the facility"; "police reports [and] restraining orders . . . involving Plaintiffs or any staff or volunteers of Pro-Life Action Ministries." Breen Decl. ¶ 41, Ex. A at 3-4X. This vigorous defense was all the more stunning given that the City had apparently soured on enforcement of Chapter 405, with the City Attorney's Office even issuing guidance that police should enforce other Minnesota statutes rather than Ch. 405. Breen Decl. ¶ 49, Ex. B at 7 (MPLS001058).

In *Khounedaleth*, the City chose to abandon its defense of its actions to protect public peace during a time of violent and destructive riots. But in this case, the City chose to vigorously defend a law it secretly doubted, against claims for nominal damages and injunctive relief favoring entirely nonviolent and law-abiding sidewalk counselors. This incoherence shows that the *Kounedaleth* plaintiff was politically favored, while Plaintiffs here were disfavored. And as a result, the City belabored discovery to make this case as difficult and costly as possible for Plaintiffs, who were principally represented by attorneys at a non-profit, exclusively pro bono firm with limited budget. The

City's decisions protracted litigation and resulted in an "extraordinary outlay of expenses" when compared to similar claims and similar litigation paths.

The City's decision resulted in these Plaintiffs incurring attorneys' fees during the unusual and pernicious discovery phase of this facial challenge. This phase lasted from October 31, 2023, when the Court denied the City's Motion to Dismiss (Dkt. 35), until December 6, 2024, when the City made its offer of judgment (Dkt. 99-1 at 3). The table below aggregates attorney hours consumed during discovery.

| Attorney/Paralegal | Pre-Discovery Hours | Discovery Hours |
|---|---|---|
| Peter Breen | 19.5 | 126.6 |
| Joan Mannix | 0.2 | 24.0 |
| Erick Kaardal | 4.5 | 0.0 |
| B. Tyler Brooks | 49.3 | 482.0 |
| Michael McHale | 6.8 | 3.4 |
| Nathan Loyd | 0.0 | 340.0 |
| Elizabeth Nielsen | 2.6 | 3.3 |
| John Grzybek | 60.7 | 0.0 |

The table below isolates the attorney fees consumed during the discovery phase.

| Attorney/Paralegal | Rate | Discovery Hours | Discovery Cost |
|---|---|---|---|
| Peter Breen | $875.00 | 126.6 | $110,775.00 |
| Joan Mannix | $875.00 | 24.0 | $21,000.00 |
| Erick Kaardal | $700.00 | 0.0 | $0.00 |
| B. Tyler Brooks | $800.00 | 482.0 | $385,600.00 |
| Michael McHale | $775.00 | 3.4 | $2,635.00 |

| | | | |
|---|---|---|---|
| Nathan Loyd | $550.00 | 340.0 | $186,972.50 |
| Elizabeth Nielsen | $450.00 | 3.3 | $1,485.00 |
| John Grzybek | $275.00 | 0.0 | $0.00 |

Thus, Plaintiffs incurred a total of $708,467.50 in attorneys' fees to comply with the City's discovery demands and hold it accountable for its own discovery obligations. Breen Decl. ¶ 53-54. But Plaintiffs were not obliged or expected to pay any of that gargantuan cost. Instead, their attorneys accepted the entire risk that these expenses would be lost. And while risk may be subsumed in the lodestar for contingency fee cases (*Miller v. Bd. of Regents of Univ. of Minnesota,* 402 F. Supp. 3d 568, 596 (D. Minn. 2019)), this case was entirely pro bono. The risk was higher, and the lodestar does not reflect this risk. Plaintiffs' attorneys here always had zero possibility (or desire) of reimbursement from clients who only suffered nominal damages.

Accordingly, Plaintiffs would qualify to receive an enhancement the "extraordinary outlay of expenses" incurred during the "exceptionally protracted" discovery phase of this case. *See Taylor v. Jones*, 653 F.2d 1193, 1206 (8th Cir. 1981) (affirming 20% enhancement); *see also Shipes v. Trinity Indus.*, 46 F.3d 67 (5th Cir. 1995) (affirming 33% enhancement).

Without such an enhancement—or the affirmation of Plaintiffs' requested out-of-district (or Minneapolis specialist) rates—the City can continue violating the constitutional rights of small nonprofits and their volunteers and

staff with impunity, knowing that even if the City loses, it won't have to pay market rates for protracted, expensive litigation. And below-market fee awards further exacerbate the inability of individuals and organizations like Plaintiffs to find lawyers to take their cases against defendants like the City. The prospect of having to front over $700,000 in discovery fees, without possibility of market recovery, will certainly deter future lawyers from representing pro bono clients challenging the City's unconstitutional behaviors, no matter how worthy the case. As the Supreme Court observed, "a 'reasonable' fee is a fee that is sufficient to induce a capable attorney to undertake the representation of a meritorious civil rights case." *Perdue*, 559 U.S. at 552.

Accordingly, if the Court decides that Plaintiffs' rates must be lowered, Plaintiffs respectfully request an enhancement. Such an enhancement amount is warranted on these facts and is necessary to account for the additional risk faced by firms representing clients with only nominal damages on a pro bono basis, and to ensure that future attorneys are willing to take on similar cases.

### III.    Plaintiffs should receive their remaining litigation costs.

"Reasonable expenses of litigation incurred by counsel on the prevailing side can be awarded as part of the fees due under [42 U.S.C. § 1988]. Such awards are not for court costs proper, but for reasonable expenses of represen-

tation." *SapaNajin v. Gunter*, 857 F.2d 463, 465 (8th Cir.1988) (citations omitted). These reasonable expenses include "expenses that a law firm normally would bill to its clients." *Williams v. ConAgra Poultry Co.*, 113 Fed.Appx. 725, 728 (8th Cir. 2004).

Plaintiffs have incurred nontaxable costs totaling $60,661.34. Breen Decl. ¶ 52, Ex. K . These costs include the following:

| Expense | Total |
|---|---|
| Travel Expenses for Attorneys | $17,958.12 |
| Discovery Vendor | $34,660.32 |
| Motion to Dismiss Hearing Transcript | $195.00 |
| Lisa Goodman Deposition Transcript | $1,561.80 |
| Lisa Goodman Deposition Video | $1,105.00 |
| Kelli Williams Deposition Transcript | $1,393.50 |
| Kelli Williams Deposition Video | $1,105.00 |
| Tim Stanley Deposition Transcript | $1,582.60 |
| Tim Stanley Deposition Video | $1,100.00 |

Courts have found that each of these costs are "reasonable expenses" to be reimbursed in an attorneys' fee and costs motion under 42 U.S.C. § 1988:

- Attorney travel: *See, e.g., Warnock v. Archer*, 397 F.3d 1024, 1027 (8th Cir. 2005) (travel expenses "are properly part of a fee award as items reasonably charged by attorneys to their clients."); *Miller v. Bd. of Regents of Univ. of Minn.*, 402 F. Supp. 3d 568, 597–98 (D. Minn. 2019).
- Discovery vendors: *See, e.g., Thorncreek Apartments I, LLC v. Vill. of Park Forest*, 2016 WL 4503559, at *10 (N.D. Ill. Aug. 29, 2016), *aff'd sub nom. Thorncreek Apartments III, LLC v. Mick*, 886 F.3d 626 (7th Cir. 2018) (discovery vendors are "expenses of litigation"); *D.G. ex rel. Strickland v. Yarbrough*, 2013 WL

1343151, at *7-8 (N.D. Okla. Mar. 31, 2013) (affirming an award of $191,176.95 for plaintiffs' "computerized data loading, storing[,] and hosting charges...during the discovery phase of the case."); *U.S. ex rel. Becker v. Tools & Metals, Inc.*, 2013 WL 1293818, at *12 (N.D. Tex. Mar. 31, 2013) (affirming an award of $257,985.23 for electronic hosting of discovery).

- Videos and transcripts of depositions: *See, e.g., Letterman v. Burgess*, 2016 WL 797601, at *8 (W.D. Mo. Feb. 26, 2016); Kaardal Decl. at ¶ 40, Ex. D at 32-35 (*Stevenson v. Bauer*, No. 0:20-cv-02007, Dkt. 103 (D. Minn. Nov. 17, 2022)).

Further, as Mr. Kaardal stated in his declaration, each of the expenses listed in the table above are reasonable and customarily charged to, and paid by, fee paying clients in Minneapolis. Kaardal Decl. ¶ 43, 44. Ms. Wagenmaker independently agrees with this conclusion. Wagenmaker Decl. ¶ 23.

Additionally, Plaintiffs have submitted a Bill of Costs pursuant to Rule 54 for $802 in fees of the clerk and $5928.40 for transcripts of Plaintiffs. Dkt. 110, 111. These should be taxed under 28 U.S.C. § 1920. *Warnock v. Archer*, 397 F.3d 1024, 2017 (8th Cir. 2005) (Rule 54 costs include such charges or fees "reasonably charged by attorneys to their clients.") Nonetheless, in the event they are denied under 28 U.S.C. § 1920, Plaintiffs respectfully request that this Court award these costs under 42 U.S.C. § 1988. *Thorncreek Apartments,* 2016 WL 4503559 at *10 ("'expenses of litigation that are distinct from . . . statutory costs [under § 1920] . . . are part of the reasonable attorney's fee allowed by' § 1988") (alterations original) (citing *Downes v. Volkswagen of Am., Inc.*, 41 F.3d 1132, 1144 (7th Cir. 1994)).

Under 28 U.S.C. §1961(a), Plaintiffs are also entitled to post judgment interest on the award of attorney fees. Pursuant to 28 U.S.C. §1961(a), Plaintiffs are entitled to the weekly average of the one year treasury rate announced by the Board of Governors of the Federal Reserve Bank the week preceding the entry of judgment by this Court. *See Ness v. City of Bloomington*, 2022 WL 1050043, at *6 (D. Minn. Apr. 7, 2022) ("[P]ost-judgment interest on attorney's fees is mandatory.").

## CONCLUSION

For the reasons set forth herein, the Court should grant Plaintiffs' Motion for Attorneys' Fees and Costs, and order the City to pay their attorneys $791,427.50 in attorneys' fees (whether on the Plaintiffs' requested rates or via an enhancement of lowered rates), and $60,661.34 in costs; for a total of $852,088.84.

Respectfully submitted, this <u>18th</u> day of February, 2025.

<u>/s/B. Tyler Brooks</u>
Peter Breen[†]
Joan Mannix[†]
B. Tyler Brooks[†]
Nathan Loyd[†]
THOMAS MORE SOCIETY
309 W. Washington Street
Suite 1250
Chicago, IL 60606
Telephone: (312) 782-1680
Fax: (336) 900-6535
pbreen@thomasmoresociety.org
jmannix@thomasmoresociety.org
tbrooks@thomasmoresociety.org
nloyd@thomasmoresociety.org

[†] admitted *pro hac vice*

Erick G Kaardal
Elizabeth A. Nielson
MOHRMAN, KAARDAL & ERICKSON, P.A.
150 South Fifth Street
Suite 3100
Minneapolis, MN 55402
Telephone: (612) 465-0927
Fax: 612-341-1076

kaardal@mklaw.com
nielson@mklaw.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on February 18, 2025, I served a copy of the foregoing document upon the following counsel of record via email:

Adam Szymanski
Tracey N. Fussy
Munazza Humayun
Sara J. Lathrop
City of Minneapolis – City Attorney's Office
105 Fifth Avenue S., Ste. 200
Minneapolis, MN 55401

*Attorneys for Defendant*

Dated: <u>February 18, 2025</u>

<u>/s/B. Tyler Brooks</u>
B. Tyler Brooks
THOMAS MORE SOCIETY
309 W. Washington St.
Suite 1250
Chicago, IL 60606
Telephone: (336) 707-8855
Fax: (336) 900-6535