## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

PRO-LIFE ACTION MINISTRIES, LUCY MALONEY, THOMAS WIL-KIN, and DEBRA BRAUN,

Plaintiffs,

v.

CITY OF MINNEAPOLIS, a Minnesota municipality,

Defendant.

Case No. 23-CV-00853 (ECT/DJF)

**DECLARATION OF PETER BREEN IN SUPPORT OF PLAINTIFFS' MOTION FOR ATTORNEYS' FEES**

---

I, Peter Breen, make the following declaration pursuant to 28 U.S.C. § 1746:

1. This Declaration sets forth the facts supporting Plaintiffs' Motion for Attorney Fees and Expenses. As lead counsel in this action, I have knowledge of the facts supporting this application for fees and expenses, and I am competent to testify to the matters stated herein.

2. Since January 1, 2023, I have served as TMS Executive Vice President & Head of Litigation. In my current position, I manage and oversee all aspects of the litigation work performed by our TMS staff attorneys, and I oversee TMS's relationships with, and approve the billings of, our many retained outside counsel.

### A. The Thomas More Society and Its Attorneys Are Recognized As Experts and Specialists in First Amendment Law,

**Especially in Relation to Pro-Life Sidewalk Speech and Conduct.**

3.      I serve as Executive Vice President & Head of Litigation of the Thomas More Society ("TMS"), a national public interest law firm headquartered in Chicago. For over 25 years, TMS has counseled and represented organizations and individuals in the pro-life movement, to defend their constitutional rights in and out of Court.

4.      TMS was founded out of a concrete need: to provide a robust defense against a nationwide class action brought by the Southern Poverty Law Center, on behalf of the National Organization for Women ("NOW"), against pro-life advocates, led by Joseph Scheidler, the founder of the Pro-Life Action League. NOW sought to apply the antitrust and racketeering laws to Scheidler, as leader of an alleged "conspiracy" comprising nearly the entire pro-life movement, seeking ruinous damages and injunctions to stop peaceable pro-life activism nationwide. Tom Brejcha, a respected business litigator in Chicago had joined the defense of Scheidler on a pro bono basis, eventually becoming lead counsel, due to the inexperience of Scheidler's initial lawyers from a small pro-life nonprofit. Mr. Brejcha was later given an ultimatum by his law partners to "quit the case or quit the firm." Refusing to leave his client without competent representation, Mr. Brejcha founded TMS in 1998, to financially support

the *Scheidler* defense. Little did Mr. Brejcha know that *NOW v. Scheidler* would become a case for the ages, pending for over 28 years and featuring three full-dress appeals to the United States Supreme Court. *See Nat'l Org. for Women, Inc. v. Scheidler*, 510 U.S. 249 (1994) (NOW victory, 9-0), *Scheidler v. Nat'l Org. for Women, Inc.*, 537 U.S. 393 (2003) (Scheidler/TMS victory, 8-1); *Scheidler v. Nat'l Org. for Women, Inc.*, 547 U.S. 9 (2006) (Scheidler/TMS victory, 8-0). Our President & Chief Counsel, Mr. Brejcha, imbued TMS with the same qualities that won the long, hard victory in *Scheidler*, a "never-say-die" spirit and a dedication to justice for "the little guy," standing against much larger and more powerful opponents.

5. In the years since its founding, TMS has never wanted for clients. Filling a critical need, TMS quickly expanded beyond its representation of Scheidler and his Pro-Life Action League, providing zealous and high quality representation for many prominent national pro-life organizations, including Live Action, Heartbeat International, NIFLA, the March for Life, Students for Life of America, 40 Days for Life, and Sidewalk Advocates for Life; national religious organizations such as the United States Conference of Catholic Bishops and the National Association of Evangelicals; along with scores of local and regional pro-life and religious organizations and many hundreds of individual

pro-life individuals and religious leaders. We have also represented Plaintiff Pro-Life Action Ministries in a variety of matters over at least the past decade, and for the past approximately 15 years, I have personally known Brian Gibson, Pro-Life Action Ministries' founder and head, and provided legal advice to him as needed.

6. TMS has extensive experience and expertise in First Amendment litigation, which is a highly specialized and complex area of law. In particular, participating counsel routinely represent pro-life sidewalk counselors across the country against enforcement of unconstitutional local ordinances and/or the federal "FACE Act," 28 U.S.C. § 248, in violation of their First Amendment freedom of speech. While many of these cases avoid litigation, a sampling of recent related matters include *People v. Griepp*, 997 F.3d 1258 (2d Cir. 2021) (granting petition for panel rehearing and vacating prior ruling that FACE Act could apply against peaceful pro-life sidewalk counseling outside an abortion facility in Queens, New York); *Coalition for Life St. Louis v. City of Carbondale, Illinois*, No. 23-cv-10651 (S.D. Ill. 2023) (First Amendment preliminary injunction challenge to post-*Dobbs* "bubble zone" outside local abortion facilities, based on *Dobbs's* recognition that *Hill* violates First Amendment; on appeal at No. 23-2367); *Hulinsky v. Cnty. of Westchester, N.Y.,* No. 22-cv-06950, 670 F.

Supp. 3d 100 (S.D.N.Y. 2023) (First Amendment preliminary injunction challenge to post-*Dobbs* restrictions on sidewalk counseling outside local abortion facilities; on appeal at No. 23-804); *Florida Preborn Rescue, Inc. v. City of Clearwater, Fla.*, No. 8:23-cv-1173, 2023 WL 7181593 (M.D. Fla. 2023) (First Amendment preliminary injunction challenge to post-*Dobbs* "buffer zone" outside local abortion facility; on appeal at No. 23-13501); *United States v. Houck*, No. 2:22-cr-00323 (E.D. Pa. Jan. 15, 2023) (full acquittal after jury trial in FACE Act case against sidewalk counselor).

7.    And TMS is not limited to pro-life sidewalk cases—TMS's clients seek its assistance in matters touching on a variety of cutting-edge First Amendment issues. *See, e.g., Nat'l Inst. of Fam. & Life Advocs. v. Raoul*, 685 F. Supp. 3d 688 (N.D. Ill. 2023) (emergency First Amendment challenge to Illinois law applying Illinois deceptive practices law to pro-life pregnancy center speech as "misinformation," preliminary injunction granted after evidentiary hearing, with State later agreeing—before discovery—to permanent injunction and payment of $155,000 §1988 fees and costs award); *Does 1-11, et al. v. Bd. of Regents of the Univ. of Colo., et al.*, 100 F.4th 1251 (10th Cir. 2024) (reversing District Court, finding religious discrimination, and entering preliminary injunction in favor of terminated employees in challenge to COVID-19 vaccine

5

mandate); *Robinson v. Murphy*, No. 20A95 (U.S. 2020) (emergency application to Supreme Court against New Jersey COVID-19 church-closure rules; application granted and district court judgment vacated); *Soos v. Cuomo*, 470 F. Supp. 3d 268 (N.D.N.Y. 2020) (statewide preliminary injunction granted against New York COVID-19 church-closure rules); *Dr. A. v. Hochul*, No. 1:21-cv-01009, 567 F. Supp. 3d 362 (N.D.N.Y. 2021) (First Amendment statewide TRO and preliminary injunction granted against New York healthcare COVID-19 vaccine mandate as against religious objectors; reversed on appeal; emergency application to Supreme Court denied over three dissenters, *see Dr. A v. Hochul*, 142 S. Ct. 552 (2021); 142 S. Ct. 2569 (2022)); *Cassell v. Snyders*, No. 20-cv-50153 (N.D. Ill. 2020) (emergency First Amendment challenge to Illinois COVID-19 church-closure rules; plaintiffs' arguments substantially adopted by Supreme Court in *Brooklyn Diocese v. Cuomo*, 592 U.S. 14 (2020) and *Tandon v. Newsom*, 593 U.S. 61 (2021)); *Air Force Officer v. Austin*, 588 F. Supp. 3d 1338 (M.D. Ga. 2022) (First Amendment preliminary injunction granted against U.S. Air Force COVID-19 vaccine mandate as against religious objector); *Jackson v. Mayorkas*, No. 4:22-cv-0825, 2023 WL 5311482 (N.D. Tex. 2023) (emergency First Amendment class action challenge to U.S. Coast Guard

COVID-19 vaccine mandate as against religious objectors; on appeal to the 5th Circuit, oral argument granted).

### B. No In-District Firm Could Have Litigated This Case on a Pro Bono Basis.

8. Because it has a national practice, TMS regularly relies on outside retained counsel to supplement TMS's in-house team of First Amendment specialists. TMS values these relationships with its many retained outside counsel, including the excellent attorneys at Mohrman, Kaardal & Erickson, P.A. ("MKE").

9. In this case, TMS represented Plaintiffs, a small nonprofit and its volunteers and staff, entirely pro bono. Facing a large, determined, and politically motivated opponent in the City of Minneapolis, with near-unlimited resources, Plaintiffs could not have brought this case, in view of the uncertainties of litigation and the likely multimillion-dollar legal fees and costs necessary to see it through trial and appeal. TMS retained MKE on a paid, hourly basis, to serve as local counsel and assist in starting the case. MKE would not have been able to join Plaintiffs' case without a guarantee of hourly payment.

10. I know of no other firm in Minnesota that would have taken on these Plaintiffs and the significant challenge of lengthy complex First Amendment federal litigation against the City of Minneapolis on a pro bono basis. The

City's conduct in vigorously litigating this case, from start to finish, shows why such financial concerns would be entirely valid. The pool of available law firms is already significantly narrowed due to opposition to taking on a client with the strongly ideological (and unpopular in the City of Minneapolis) mission of Plaintiffs and the nature of their activities. And the number dwindles after removing those law firms that lack the capacity or competence to engage in complex federal constitutional litigation. The extreme cost burden of taking on a case like this one, against the largest City in the State, only further drives the nails into the coffin. Without the offer of pro bono representation from TMS, this case couldn't have been brought by Plaintiffs against the City of Minneapolis.

### C. The Thomas More Society Is Uniquely Qualified to Litigate This Case Due to Its Expertise and Specialization.

11.     TMS has an in-house team of fifteen staff attorneys, including the TMS attorneys who appeared in this case. Our fifteen staff attorneys comprise a team of highly skilled trial and appellate attorneys with expertise in First Amendment law, particularly as it relates to protecting the speech of pro-life advocates outside the nation's abortion facilities. The sampling of representative cases listed above is testament to this fact. I am proud to lead and recruit new attorneys into this team of extremely smart, hard-working, and collegial

litigators. In order to serve the needs of pro-life organizations and individuals, and religious organizations and people of faith, TMS has put together this team of highly skilled practitioners, competent to vigorously litigate against the very best lawyers in the country at both the trial and appellate levels.

12.     TMS's experience and expertise in handling these pro-life speech cases, a unique and difficult specialty within First Amendment law, is unmatched. The Supreme Court recently echoed the late Justice Scalia's observation, holding that the High Court's abortion jurisprudence has bled over into and "distorted First Amendment doctrines." *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 287 (2022). TMS is well-versed in litigating through this "distortion" in federal court, against politically motivated and powerful government entities that violate the constitutional rights of pro-life organizations and individuals.

13.     TMS is one of a handful of top public interest law firms in the nation litigating on the issue of abortion and abortion speech, from a pro-life perspective—and none of the others are in the Midwest. Because of our ongoing representation of organizations like Sidewalk Advocates for Life, which serves as the umbrella organization for pro-life sidewalk advocates at 282 locations across the country, there is no other public interest law firm in the country

with more experience in representing sidewalk counselors against hostile municipal governments. In this particular case, we have at least a decade-long relationship with Plaintiff Pro-Life Action Ministries. Moreover, no other law firm in the country has as much experience litigating the Freedom of Access to Clinic Entrances (FACE) Act (42 U.S.C. § 248) as TMS. That Act and its reach and implications have been at issue in this litigation.

14.    Given TMS's extensive expertise in the specific area of constitutional law at issue in this case and its familiarity with the specific facts of the lead Plaintiff here and similar organizations across the country, there is no doubt that TMS could (and did litigate this matter more quickly and efficiently than an in-District firm without this extensive expertise and knowledge could have.

### D. Thomas More Society Staffed This Case As Efficiently As Possible.

15.    TMS staffed this matter in the most efficient way possible. Due to the importance of this case and my personal familiarity with the client, I initially assigned myself to the case, along with Tyler Brooks, a TMS Senior Counsel and veteran litigator entering his 19th year of practice. MKE drafted the initial Complaint in the matter, and after the prior District Court ordered that

an Amended Complaint be filed, Mr. Brooks took over that amendment, followed by the briefing on the City's Motion to Dismiss, which I then argued. Once this Court denied the City's Motion and it was clear that the case was proceeding to discovery, I added Nathan Loyd, a TMS Counsel and rising ace 5th year litigator.

16.     While we regularly pull in TMS staff attorneys to assist at discrete points in a case, I prefer to assign a small core team, usually no more than three attorneys, to principally litigate a matter. This way, case knowledge is preserved, and duplication is minimized. That model was effective in this case—that team secured a total victory in hard-fought litigation against a determined opponent, all without excessive time spent on the matter.

17.     Efficiency at TMS is critical. We are privileged to have many more requests for legal assistance than we can provide—for this reason, TMS does not have the luxury of overstaffing a matter with excess attorneys. And because we do not charge our clients for our work, there is no potential pressure on attorneys to "churn" a file or otherwise inflate their work on a case. Our team members are expected to efficiently do their work and proceed to the next (often pressing) matter. Our attorneys joined TMS because they share a deep

commitment to the public service mission of the organization, and any time wasted would detract from that critical mission.

18. Our entire TMS legal team also meets weekly, and each attorney has the opportunity during that meeting to receive input on any particularly unique issues that may arise in a particular litigation. Those meetings are not billed to any single case and thus provide a no-cost-added value to TMS's work in this matter (and others). These meetings also mean that, when a TMS attorney is pulled in on a matter, the attorney already has at least basic knowledge of the case and its critical issues.

19. Attached to this declaration is a cumulative hours spreadsheet, at Exhibit L. The spreadsheet presents time entries for MKE and TMS attorneys.

20. Our standard practice at TMS is that attorneys must enter their time records contemporaneously upon the conclusion of daily legal services provided, and these contemporaneous records are reflected in the spreadsheet at Exhibit L. All time expended by TMS staff was recorded by its attorneys contemporaneously with the work being performed by the attorney performing the work.

21. As part of my responsibility to review the time entries submitted with this fee application, I reviewed and approved each and every time entry

added to the cumulative hours spreadsheet for TMS employees. The services performed in the above captioned matter were reasonably and necessarily performed by TMS in representing Plaintiffs.

22. I excluded from the submitted time records attorney hours that I deemed to be too high for a particular task, and I excluded smaller time entries from TMS attorneys who assisted in a limited, one-off fashion on the case. I have also excluded our paralegal time entirely.

### E. Thomas More Society's Participating Attorneys Are Highly Experienced Experts and Specialists in the Field of the First Amendment and Pro-Life Speech at Abortion Facilities.

23. B. Tyler Brooks has been employed as Senior Counsel with the Thomas More Society since January 2023. Prior to being hired as a Senior Counsel in January 2023, he was a Special Counsel for the Thomas More Society for several years.

24. Mr. Brooks earned a B.A., *summa cum laude*, in Latin with Departmental Honors from Wake Forest University in 2003, where he was awarded the M.D. Phillips Prize in Classical Languages and elected to Phi Beta Kappa. He received his J.D. from Vanderbilt University Law School in 2006 and further holds an LL.M. from Villanova University. At Vanderbilt, he studied under three of the nation's most well-respected constitutional law scholars:

James F. Blumstein, Suzanna Sherry, and Tom McCoy. Mr. Brooks clerked for United States District Judge Bernice B. Donald of the Western District of Tennessee from 2008 to 2011, prior to her elevation to the Sixth Circuit.

25. He was first admitted to the bar in 2006 in Tennessee, and he has subsequently been admitted to practice in three other states. Mr. Brooks is further admitted to practice before more than 30 other federal appellate and trial courts. A Life Fellow of the American Bar Foundation and Past President of the Eastern District of North Carolina Chapter of the Federal Bar Association, Mr. Brooks previously served as a founding member of the Section Council of the North Carolina Bar Association's Appellate Practice Section and currently serves on the NCBA's Appellate Rules Committee. He has been an adjunct faculty member at the University of Memphis School of Law, Trinity School of Law, and Thales College and is frequently called upon to teach CLEs.

26. When Mr. Brooks entered the private practice of law in 2011, he first focused on complex civil and commercial litigation and employment law cases. Beginning around 2016, this practice developed to include a focus on constitutional law litigation, including First Amendment litigation, which he has continued to the present. For example, he was a member of the outside counsel team that represented the Governor of North Carolina and other state

parties in defending a recently enacted state law in high-profile litigation, involving the U.S. Department of Justice and civil rights groups and cutting-edge issues of constitutional law. He successfully prosecuted a First Amendment lawsuit in the U.S. District Court for the Western District of North Carolina to challenge actions taken by the City of Charlotte that interfered with a ministry's public sidewalk activities, and in another matter he secured a federal court preliminary injunction reversing a ban from certain public property imposed on a citizen by a County Board of Elections in violation of her First Amendment rights.

27.    Moreover, while employed by a public interest firm other than TMS, he represented two defendants in the *Griepp* civil FACE case discussed above. Mr. Brooks served as the lead attorney for these two defendants, who were not represented by TMS, in a multi-week hearing in the U.S. District Court for the Eastern District of New York (Brooklyn) that resulted in a favorable ruling from the District Court denying the State of New York's request for an injunction against his clients, a decision that was upheld on appeal.

28.    Michael McHale is also Senior Counsel with the Thomas More Society. He has over 12 years of specialized legal experience, almost exclusively devoted to First Amendment issues. Since 2020, he has been lead or co-lead

drafter in five successful federal court motions for preliminary injunctions pursuant to the First Amendment, including in *Soos v. Cuomo*, 470 F. Supp. 3d 268 (N.D.N.Y. 2020); *Dr. A v. Hochul*, 567 F. Supp. 3d 362 (N.D.N.Y. 2021), *rev'd on appeal, emergency application to the Supreme Court denied over three dissenters*, 142 S. Ct. 552 (2021), *application for writ of certiorari denied over three dissenters*, 142 S. Ct. 2569 (2022); *Air Force Officer v. Austin*, 588 F. Supp. 3d 1338 (M.D. Ga. 2022); *Nat'l Institute of Family and Life Advocs. v. Raoul*, 685 F. Supp. 3d 688 (N.D. Ill. 2023); and *Does 1-11, et al. v. Bd. of Regents of the Univ. of Colo., et al.*, 100 F.4th 1251 (10th Cir. 2024). He was also co-lead drafter in a successful petition for rehearing and rehearing *en banc* in *People of New York v. Griepp*, 997 F.3d 1258 (2d Cir. 2021) and *New York by James v. Griepp*, 11 F.4th 174 (2d Cir. 2021), involving the First Amendment limits on otherwise neutral statutes as applied to pro-life sidewalk counseling on public streets and sidewalks.

29. Mr. McHale studied under the renowned First Amendment scholar Professor Richard F. Duncan at the University of Nebraska College of Law, who is regularly consulted as a leading expert in First Amendment cases of national import. *See, e.g.,* Brief of Amici Curiae Seven Legal Scholars (including Professor Duncan) in Support of Petitioners, *Roman Catholic Diocese*

*of Albany, et al. v. Harris, et al.*, No. 24-319 (U.S.). Further, the *Harvard Journal of Law & Public Policy* has proclaimed that Mr. McHale's aforementioned victory in Soos v. Cuomo was the only case in the country, out of more than a hundred, where a court did not rely on Chief Justice Roberts' concurring opinion denying an injunction in *South Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613 (May 20, 2020), before the Supreme Court's Thanksgiving-eve decision in *Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. 14 (2020). See Josh Blackman, The "Essential" Free Exercise Clause, 44 Harv. J.L.P.P. at 676-77 n.210 ("In every case but one, the courts relied on elements of Chief Justice Roberts's concurrence, and ruled against the house of worship." (citing *Soos v. Cuomo* as the sole exception)). Mr. McHale also previously clerked for the U.S. Court of Appeals for the Eighth Circuit.

30.     Nathan Loyd is Counsel with TMS. Mr. Loyd earned a B.S. in Aerospace Engineering from the University of Notre Dame, an M.S. in Nuclear Engineering from the Air Force Institute of Technology, and an M.A. in Theology and Bioethics from Holy Apostles College and Seminary. He earned his law degree, *cum laude*, from Georgetown University Law Center in 2020.

31.     Before joining TMS, Nathan served as an officer in the United States Air Force, and he continues to serve as a Major in the Air Force Reserves. In the Air Force, he has commanded more than seventy Airmen and civilians performing counterterrorism and counterproliferation work, often with Presidential-level interest. He was recently hand selected to be the executive officer for the Lieutenant General commanding roughly 70,000 Airmen in the Air Force Reserve. Mr. Loyd has also served as the president of a nationwide hybrid-homeschooling association serving over 1,000 children. Mr. Loyd is a member of the Patent Bar and was previously an intellectual property attorney at a prominent patent litigation law firm. He is the holder of four patents for cutting edge blockchain technology. Mr. Loyd's expertise in technology is especially useful at TMS in handling matters like e-discovery, and was crucial in this case because the City's tangled productions required him to deconflict thousands of pages of conflicting documents and privilege claims. Thanks to his technical background, he synthesized this information more efficiently and precisely than any other firm employee.

32.     Joan Mannix is Executive Vice President and Managing Counsel at TMS. In addition to her TMS managerial duties, she also participates in trial and appellate litigation for the firm. She graduated from the University

of Notre Dame in 1985, and after a year in the Peace Corps, serving in Burkina Faso, she attended the Notre Dame Law School, graduating in 1989. Ms. Mannix has written hundreds of appellate briefs over her distinguished career and argued before numerous state and federal appellate courts. Recognized as an Illinois "Super Lawyer" multiple times, Ms. Mannix has also contributed to Illinois Institute of Continuing Education (IICLE) publications, co-authoring chapters on Settlement and Compromise and Settlement Procedures. Ms. Mannix has served TMS for over a decade, writing and editing briefs and mentoring younger lawyers. Her most recent victory for the firm came in the case, *Kindschy v. Aish*, 412 Wis.2d 319 (2024), where she drafted principal and multiple supplemental briefs and delivered oral argument, and a rare reargument, before the Wisconsin Supreme Court. In *Aish*, after those marathon proceedings, Ms. Mannix won reversal on First Amendment grounds of the lower court's decision imposing of a civil-harassment injunction against a peaceful pro-life advocate.

33.    As for the undersigned, I joined TMS as Legal Counsel in February 2008. In my early years with the firm, I had the privilege of training under Mr. Brejcha, a giant of the First Amendment bar—who himself learned at the feet of Barnabas Sears, a past president of the American College of Trial Lawyers

and former chairman of the American Bar Association's House of Delegates. From 2008 to present, Mr. Brejcha promoted me to Executive Director & Legal Counsel and then to Vice President & Senior Counsel, before I assumed my current role. I have been honored to represent pro-life advocates and organizations, and religious leaders and churches and people of faith, in hundreds of matters in the years since. I have litigated numerous high-profile complex constitutional matters in trial and appellate courts across the country, in both federal and state court. Two recent cases of note include *Nat'l Inst. of Fam. & Life Advocs. v. Raoul*, where I served as lead trial counsel and conducted the successful evidentiary hearing that won the plaintiffs a preliminary injunction against enforcement of a newly enacted anti-pro-life-speech statute, and *United States v. Houck*, a high-profile felony FACE Act prosecution, where I served as trial counsel, winning a victory over the United States Department of Justice in a case brought against a sidewalk counselor, pressing a dangerous theory that would have curtailed protected speech and been an abusive expansion of the scope of the FACE Act. My direct courtroom experience is also rounded out by state and local legislative experience: from 2011-2014, I served as an elected municipal council member in the western suburbs of Chicago, including serving as interim mayor after the untimely death of our mayor, and

from 2015-2019, I served as an elected member of the Illinois House of Representatives, while maintaining my law practice. Notably, in my second term, I was elevated to House Republican Floor Leader, whose job is to lead the opposition debate on all bills brought forward by the Democratic majority—I debated hundreds of bills for our Caucus while serving in that role. I am a 1997 graduate of Vanderbilt University, earning an electrical engineering degree in three years from that institution, and a 2000 graduate of the University of Notre Dame Law School. I am a member of the Illinois Bar and the Patent Bar. Prior to joining TMS, I worked in various roles in intellectual property litigation, patent prosecution and opinion work, and nonprofit law and management.

### F. The Hourly Rates Are Reasonable, Whether Viewed As Chicago Rates or Minneapolis Specialist Rates.

34.     As noted above, Plaintiffs seek out-of-district rates, in line with the Chicago legal market—which also align with Minneapolis specialist rates. The support for the Chicago rates is detailed in Ms. Wagenmaker's Declaration submitted herewith:

| **Attorney/Paralegal** | **Rate** |
|------------------------|----------|
| Peter Breen            | $875     |
| Joan Mannix            | $875     |
| B. Tyler Brooks        | $800     |

| Michael McHale | $775 |
|---|---|
| Nathan Loyd | $550 |

35. While we at TMS do not charge our clients for our work, we are generally familiar with the rates for other attorneys engaged in similar work. In my own conversations in the normal course with my colleagues who are partners involved in complex federal litigation at other (for-profit) firms in Chicago, the proposed rates here are below what their firms charge. This comports with the rates for Chicago litigators listed in the Wolters Kluwer 2023 Real Rate Report. This report provided reliable reference for rates charged by litigators in both Chicago, Minneapolis, and across the country. I personally reviewed this report, which is attached as Ex. O, and have no reason to doubt its representations of these various legal markets. I also understand that Ms. Wagenmaker and Mr. Kaardal, both of whom operate for-profit firms, concur that this report is accurate and reliable.

36. Moreover, Mr. Kaardal in his Declaration gave further support for TMS rates being reasonable for expert specialists. He also recited a number of cases in this District, showing that the proposed rates for the TMS attorneys are consistent with rates awarded here. *See Nguyen v. Foley,* 2022 WL 1026477, at *4 (D. Minn. Apr. 6, 2022) (hourly rates of $855 for a partner, equivalent to $933 per hour in December 2024 dollars, and rates ranging from

$435 per hour to $560 per hour for associates, equivalent to $475 to $611 per hour in December 2024); *Madison v. Willis*, 2011 WL 851479 (D. Minn. Mar. 9, 2011) ($600 per hour for a partner in 2011, equivalent to $847.09 today); *King v. Turner*, 2007 WL 1219308 (D. Minn. Apr. 24, 2007) (partner's $500 per hour rate was reasonable, $763.49 equivalent today); *Stevenson v. Bauer*, No. 0:20-cv-02007, Dkt. 103, at 9 (D. Minn. Nov. 17, 2022) (attached as Kaardal Exhibit D) (partner rates ranged from $685 to $855, equivalent to $725 to $905 today, rejecting City of Minneapolis's proposed alternative range of $620 to $775, due to the attorneys' expertise in civil rights litigation).

37.     I note that TMS does not (and cannot, consistent with IRS regulations on public interest law firms) take cases on a contingency basis, but instead on a pro bono basis. TMS bore the entire financial risk of pursuing this case, with no guarantee of recovery.

38.     Turning to the MKE attorneys, I know them to be excellent Minneapolis litigators. Based on my review of Mr. Kaardal's Declaration and the 2023 Real Rate Report for the Minneapolis legal market, the MKE rates presented in the Motion for Attorneys' Fees and Costs fall easily in line with prevailing market rates in this region.

### G. The City's Aggressive Litigation Posture Required A Significant Expenditure of Attorney Time.

39.     In reviewing the hours reports in preparation for this Motion, I noted that the lion's share of the time required on this case involved discovery. I carefully reviewed those entries and excluded any overly duplicative entries. As noted above, we do not overstaff cases, and there is no incentive in our firm to "churn" files. The entries submitted to the Court are thus reflective of necessary hours spent to maintain and win this hard-fought litigation.

40.     The City clearly took an aggressive posture in discovery, which necessarily increased the number of hours necessary to litigate this case. Expert, determined litigators were thus absolutely appropriate, and likely necessary, to handle the flurry of discovery and ultimately win the case.

41.     First, the City demanded extensive discovery into Plaintiffs' history and activities. This was unusual, because the City bore the burden of proving the necessity of its own ordinance, and should not have passed the ordinance unless it already had enough evidence. The City issued broad requests for production, sweeping in communications two years prior to ordinance's passage. *See* Ex. A (City's Requests for Production), at 4. All told, Plaintiffs found almost 300,000 pages of their own documents which were potentially responsive, based on the matters the City requested. TMS attorneys had to screen all of them for relevance and privilege and ended up producing over 2,000 pages

and 237 body camera videos each 315 megabytes in size, directly in response to the City's demands. This significantly increased our discovery costs, because discovery vendors charge per gigabyte. The City well knows this, because it informed Judge Foster that it uses the same discovery vendor (Everlaw) as TMS did. The City also demanded four depositions, one of each Plaintiff (including a corporate designee for Plaintiff Pro-Life Action Ministries), none of whom had any history violating the FACE Act, Ch. 405, or any other relevant law, and all of whom had similar experiences at the Planned Parenthood. These redundant depositions triggered travel costs for two attorneys for each. I note that the City brought two or three attorneys to each deposition as well, showing that our equivalent manning was necessary and reasonable for the complexity of this case.

42. Moreover, by its own admission, the City made numerous errors with its own discovery productions that resulted in incoherent privilege claims, bates number overlaps, claw back demands, and the need for corrective productions, all of which consumed much attorney time to unravel. In this process, the City also "discovered" it had improperly withheld and over-redacted numerous documents, resulting in four reissued productions and additional documents available to Plaintiffs.

43.    Importantly, in June 2024, Plaintiffs sent multiple letters to the City identifying many documents that appeared to include communications between the City attorneys and employees of non-party Planned Parenthood. When the City refused to produce these communications, Plaintiffs requested the Court's assistance through its Informal Dispute Resolution ("IDR") process. The IDR hearing, which was held on July 11, 2024, established that the City waived privilege when one of its attorneys consented to disclosures to third parties, either by personally sharing privileged material, or being included on communications where non-attorney staff shared privileged material.

44.    After the IDR, the City continued to permit Plaintiffs to possess many documents in which City staff disclosed City attorney advice to third parties, allegedly without City attorney knowledge at the time of the disclosure. And the City did so until its abrupt change of position on August 16, 2024—more than a month after IDR—when it first claimed privilege as to items it had never before asserted were privileged. In fact, the City waited to assert privilege for many months after it produced the documents, during which time it allowed Plaintiffs to possess those documents before suddenly reversing course. For example, the City provided its first production in February 2024, but failed to assert any privilege as to certain of those documents

until August 16. Thus, for roughly six months, these clawed back documents stood as part of that body of record evidence in this matter.

45.     Eventually, as the parties sorted out the City's privilege claims, the City was forced to reissue three productions to clean up their privilege errors. This included both releasing additional documents, clawing back some documents, and reproducing documents with different redactions. In all, 179 pages were replaced.

46.     Just two weeks prior to Plaintiffs' first deposition—and after the City had completed all of its depositions of Plaintiffs—the City first made new privilege claims, presumably when it realized that the disclosed documents did not help its case. The City then asserted a claw back, even to the point of clawing back documents in the middle of the deposition of former Council Member Lisa Goodman, the chief Sponsor of the subject ordinance.

47.     When Plaintiffs brought the issue of Plaintiffs' untimely claw backs before Magistrate Judge Foster—this time with briefing and simply through IDR—the City blamed the multiple issues in its document productions on its discovery vendor.

48.     Even after the second hearing with Judge Foster, the City continued its claw backs, announcing yet two more claw backs—one on November 27, 2024, and the second on December 9, 2024.

49.     Of the documents the City produced and did not claw back, two stand out in particular. True and accurate copies of these documents are attached as Ex. B (Pages from City productions), with relevant portions highlighted. First was MPLS000568, which showed that it was the common understanding among the City and Planned Parenthood that the principal intent in enacting Ch. 405 was to reiterate the FACE Act. Ex. B at 1. The second was MPLS001057. The City rescinded its privilege designation on this document following our challenges. This document shows that the City Attorney's Office had instructed police to enforce state laws, rather than Ch. 405. Ex. B. at 7.

50.     The FACE Act, which TMS specializes in, played a significant role in Plaintiffs' legal theories of this case. The City discussed it in two depositions of Plaintiffs. Ex. C (Wilkin Deposition Excerpts), Ex. D (Maloney Deposition Excerpts). Plaintiffs deposed each defense witness on their knowledge of the FACE Act as well. Ex. E (Goodman Deposition Excerpts), Ex. F. (Stanley Deposition Excerpts), Ex. G (Williams Deposition Excerpts). Although the case ended before Plaintiffs could conduct their 30(b)(6) deposition of the City, they

also planned to depose the City representative on the FACE Act. Ex. H (Plaintiffs' 30(b)(6) Notice) at 7.

51. The FACE Act figured prominently outside of documents production and depositions as well. The FACE Act was raised during the Motion to Dismiss Hearing (Ex. I. (Motion to Dismiss Transcript Excerpts)), and the City itself pointed to the FACE Act as an alternative it considered before passing Ch. 405 (Ex. J (City's Supplemental Responses to Interrogatories) at 2). Both of these informed Plaintiffs' discovery strategy in this case.

52. As a result of this intensive and belabored discovery process, Plaintiffs incurred significant expenses meeting their discovery obligations and probing the City's defenses. The vast majority of Plaintiffs' costs were incurred during the discovery phase of this case and are recorded in Ex. K. Ex. K also includes receipts for our discovery vendor (Ex. K at 5-13) and transcripts and videos (Ex. K at 14-24). I personally reviewed that the travel expenses, and certify they were all necessary and reasonable.

53. The extensive discovery phase also consumed significant attorney time. Ex. L records all of the hours submitted by both MKE and TMS attorneys. The table below records the number of hours each member of the legal team

required, separated by phase of litigation, as summarized from the attached hours log.

| Attorney/Paralegal | Pre-Discovery Hours | Discovery Hours |
|---|---|---|
| Peter Breen | 19.5 | 126.6 |
| Joan Mannix | 0.2 | 24.0 |
| Erick Kaardal | 4.5 | 0.0 |
| B. Tyler Brooks | 49.3 | 482.0 |
| Michael McHale | 6.8 | 3.4 |
| Nathan Loyd | 0.0 | 340.0 |
| Elizabeth Nielsen | 2.6 | 3.3 |
| John Grzybek | 60.7 | 0.0 |

54.     As the chart shows, Plaintiffs required a modest amount of time to litigate this case through their victory on the Motion to Dismiss. In my experience, most First Amendment facial challenges settle at this point, because the facts are often already well-developed and reduced to pure matters of law. In fact, the City of Minneapolis followed this path in a recent First Amendment case, *Khounedaleth v. City of Minneapolis*, No. 0:20-cv-02325, Dkt. No. 40 (D. Minn. Mar. 25, 2022), attached as Ex. M. There, the City lost its Motion to Dismiss on the Plaintiff's First Amendment claim and promptly made a Rule 68 Offer of Judgment. See Ex. N (*Khounedaleth* Docket). Had our case settled at a similar time frame as *Khounedaleth*, our time and costs would likely have been similar to or below those we secured in *Nat'l Inst. of Fam. & Life Advocs.*

*v. Raoul,* which also settled after we prevailed on a Motion for Preliminary Injunction.

55.    The bulk of the time incurred in this matter is thus attributable to this pattern of problems in the City's productions, wherein it repeatedly changed the set of document discovery and caused unnecessary confusion for Plaintiffs' counsel.

56.    Accordingly, it is my considered opinion, based on my significant litigation experience in the field of First Amendment law, that all of the hours for which compensation is claimed by attorneys for the Plaintiffs in this case are reasonable and that they were necessarily incurred in the prosecution of this matter.

I declare under penalty of perjury that the foregoing is true and correct.

**Dated:** February 18, 2025

/s/Peter Breen<br>Peter Breen